J-E01004-25          2026 PA Super 43

| | | |
|---|---|---|
| DANA BURNLEY AND RALPH BURNLEY, H/W | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LOEWS HOTEL, PHILADELPHIA HOTEL OPERATING COMPANY, INC., TWELFTH STREET HOTEL ASSOCIATES, AUDIO VISUAL SERVICES GROUP, INC. D/B/A PSAV PRESENTATION SERVICES, LAWALL COMMUNICATIONS, CHECKERS INDUSTRIAL PRODUCTS, CHECKERS SAFETY GROUP, CHECKERS INDUSTRIAL SAFETY PRODUCT, FIREFLY CABLE PROTECTORS, LINEBACKER  CABLE MANAGEMENT AND ASCENDANT VENTURES, INC. | : | No. 370 EDA 2023 |
| | : | |
| v. | : | |
| | : | |
| INDUSTRY ADVANCED TECHNOLOGIES, INC., ASCENDANT VENTURES, INC., FALLINE CORPORATION, FOH PRODUCTIONS, EVAN ANDREWS, EVAN ANDREWS DESIGN AND ALLEN PRICE, PRICE PRODUCTIONS, LLC AND CHRISTOPHER HASSFURTHER | : | |
| | : | |
| APPEAL OF: CHECKERS INDUSTRIAL PRODUCTS, LLC | : | |

Appeal from the Judgment Entered January 10, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  160901257

| | | |
|---|---|---|
| DANA BURNLEY AND RALPH BURNLEY, H/W | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

J-E01004-25

|                               |   |                     |
|-------------------------------|---|---------------------|
| Appellants                    | : |                     |
|                               | : |                     |
|                               | : |                     |
|                               | : |                     |
| v.                            | : |                     |
|                               | : |                     |
|                               | : | No. 485 EDA 2023    |
|                               | : |                     |
| LOEWS HOTEL, PHILADELPHIA     | : |                     |
| HOTEL OPERATING COMPANY, INC.,| : |                     |
| TWELFTH STREET HOTEL          | : |                     |
| ASSOCIATES, AUDIO VISUAL      | : |                     |
| SERVICES GROUP, INC. D/B/A PSAV| : |                    |
| PRESENTATION SERVICES, LAWALL | : |                     |
| COMMUNICATIONS, CHECKERS      | : |                     |
| INDUSTRIAL PRODUCTS, CHECKERS | : |                     |
| SAFETY GROUP, CHECKERS        | : |                     |
| INDUSTRIAL SAFETY PRODUCT,    | : |                     |
| FIREFLY CABLE PROTECTORS,     | : |                     |
| LINEBACKER  CABLE MANAGEMENT  | : |                     |
| AND ASCENDANT VENTURES, INC.  | : |                     |
| v.                            | : |                     |
|                               | : |                     |
|                               | : |                     |
| INDUSTRY ADVANCED             | : |                     |
| TECHNOLOGIES, INC., ASCENDANT | : |                     |
| VENTURES, INC., FALLINE       | : |                     |
| CORPORATION, FOH PRODUCTIONS, | : |                     |
| EVAN ANDREWS, EVAN ANDREWS    | : |                     |
| DESIGN AND ALLEN PRICE, PRICE | : |                     |
| PRODUCTIONS, LLC AND          | : |                     |
| CHRISTOPHER HASSFURTHER       | : |                     |

Appeal from the Judgment Entered January 10, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  160901257

BEFORE:  LAZARUS, P.J., BOWES, J., PANELLA, P.J.E., DUBOW, J.,
McLAUGHLIN, J., KING, J., SULLIVAN, J., BECK, J., and LANE, J.

OPINION IN SUPPORT OF PER CURIAM ORDER TO AFFIRM BY LANE, J.:

**FILED MARCH 5, 2026**

Checkers  Industrial  Products,  LLC  ("Checkers")  appeals  from  the

judgment entered in favor of Dana Burnley ("Mrs. Burnley") and Ralph Burnley

- 2 -

("Mr. Burnley") (collectively, "the Burnleys") in this products liability action, and the Burnleys cross-appeal from the judgment. After careful review, we affirm.

The trial court summarized the relevant factual and procedural history of this matter, as follows:

> On September 26, 2014, . . . [Mrs.] Burnley attended a conference at a hotel in Philadelphia. She tripped and fell on a defective "cable protector" (a device laid on the hotel ballroom floor to protect temporary audiovisual cables and wiring) and badly fractured her ankle. This serious injury led to hospitalizations, surgeries[,] and other medical procedures, and has . . . cause[d] debilitating, permanent pain.
>
> * * * *
>
> The Burnleys filed suit in . . . September . . . 2016, asserting claims for negligence[ and] strict liability . . .. The Burnleys alleged that some of the defendants . . . had negligently created the hazardous condition in the ballroom where Mrs. Burnley fell. [The Burnleys further] alleged that Checkers and related entities . . . were strictly liable because they had manufactured, distributed, or sold the cable protector involved in Mrs. Burnley's injury, and that the cable protector was defective.
>
> . . . Checkers filed a joinder complaint against Industrial Advanced Technologies, Inc. ("IAT"), Ascendant Ventures, Inc. ("Ascendant"), and FallLine Corporation ("FallLine"), alleging that IAT had manufactured and/or distributed the cable protector, Ascendant had distributed it, and FallLine had manufactured it at IAT's direction. Checkers alleged that its only connection with the cable protector was that it had purchased certain IAT assets seven months after Mrs. Burnley's accident. Checkers also filed crossclaims against a number of other defendants.
>
> IAT and Ascendant filed preliminary objections [which the trial court] sustained . . ., dismissing IAT and Ascendant from the action. . . . [As] the case approached trial . . ., six defendants remained: Checkers, FOH Productions [("FOH")], and FallLine, which were allegedly strictly liable for the cable protector, and

Lawall Communications [("Lawall")], Loews Hotel, and Evan Andrews Productions, which allegedly negligently created the condition in the ballroom that caused Mrs. Burnley's fall. [Each of these remaining defendants, other than Checkers, reached a settlement with the Burnleys, leaving Checkers as the sole defendant to appear at trial.]

* * * *

Checkers filed a motion for extraordinary relief [and a motion *in limine*] . . . asking for an emergency continuance of the August 22[, 2022] trial date [on the basis] that the Burnleys had surprised Checkers with two last-minute disclosures: that Mrs. Burnley had lost her job because of pain from her injuries, and that she was scheduled to have surgery to implant a spinal cord stimulator two weeks before trial.  Checkers argued that it needed time to conduct discovery on these issues in order to adequately prepare for trial.  Checkers repeated this request in [an additional motion *in limine*.]  The Burnleys responded that prior discovery and expert reports had put Checkers on notice that the job loss and surgery were likely to occur.  . . . The Honorable Linda Carpenter [("Judge Carpenter")] entered an order requiring Mrs. Burnley to produce medical records from the spinal cord stimulator placement . . . and to appear for a Zoom deposition, limited to the topics of [her] termination . . . and her surgery[,] and . . . submit . . . employment records.

. . . Judge Carpenter entered an order formally denying the motion for extraordinary relief . . . ..  At argument [before Honorable Michele Hangley ("Judge Hangley")] o[n] the continuance[-]related motions *in limine*, Checkers' counsel told [Judge Hangley] that that he had received [Mrs. Burnley's] medical records and some, but not all, of [her] employment records, and had deposed Mrs. Burnley.  [Judge Hangley] denied relief, finding that Judge Carpenter had adequately addressed the late-disclosure issue.

* * * *

The parties agreed that the cable protector Mrs. Burnley stepped on had a manufacturing defect.  At the time the cable protector was manufactured, IAT produced Firefly brand cable protectors by supplying molds to FallLine, which poured polyurethane into the molds to form the two pieces of the cable

protector. At times, FallLine also assembled the hinging mechanism and shipped the finished cable protectors to customers. For part of this relationship, IAT provided molds made of urethane; these molds, in turn, had been made from an aluminum master. At one point, however, IAT asked FallLine to manufacture a second mold, using IAT's aluminum master. FallLine did so, using a material that (as it turned out) was less prone to shrinking than the materials IAT had been using. The result was that some of the parts that FallLine produced were smaller than other Firefly parts, which meant that some assembled Firefly cable protectors had a top layer that was slightly shorter than the bottom layer. At trial, there was conflicting evidence of whose fault this was—IAT's for giving FallLine incorrect molds, or FallLine's for pouring and assembling misaligned cable protectors. It was not in dispute, however, that about [fifty] Firefly cable protectors had a manufacturing defect and that IAT and FallLine knew about this defect by January 2014.

. . . [I]n 2014—after IAT and FallLine learned about the defect, but before Mrs. Burnley's accident—IAT and FallLine shipped a batch of the defective cable protectors to . . . FOH . . .. After that, FOH . . . rented a batch of cable protectors to Lawall for the conference Mrs. Burnley attended.

There was no evidence that Checkers knew about the defective batch of cable protectors when it purchased IAT's assets in 2015. There was also no evidence that Checkers ever used the mismatched molds or produced cable protectors with the same manufacturing defect.

* * * *

[Throughout the litigation, Checkers argued that it could not be liable to the Burnleys under a successor liability theory because IAT manufactured the defective cable protector and Checkers merely purchased the assets of IAT without assuming any of IAT's debts or liabilities. In response, the Burnleys argued that the product line exception applied, which permitted application of successor liability for defective products despite Checkers' mere purchase of assets from IAT.] At trial, the jury heard the following evidence relevant to the successor liability and product-line exception issues:

On April 1, 2015, about eight months after Mrs. Burnley's accident, Checkers and IAC entered into an Asset Purchase Agreement ("APA"). Under the APA, Checkers purchased IAT's cable protector business. Although Checkers contends that [it] purchased only one product line (the Firefly brand cable protectors), Checkers' corporate designee, William Eaton [("Eaton")], agreed that Checkers had purchased "all Firefly inventory" and "all of IAT's equipment," "IAT's customer list," "all of IAT's intellectual property," "all of the molds for cable protectors . . . the patents for cable protectors, [and] the trade shows and trade names concerning Firefly." The APA included a non[-]compete clause, which prohibited IAT from manufacturing, marketing, or selling cable protectors.

After the transaction, Checkers announced that it had "acquire[d] Firefly cable protectors" and that "[t]his acquisition brings together two leaders in the cable management industry." Checkers continued to produce Firefly cable protectors with the Firefly logo and "IAT" stamped into the tread. Checkers' corporate representative agreed that "after the acquisition and merger of IAT and Checkers[,] . . . Checkers continue[d] to market itself as an ongoing enterprise that manufactured and sold the Firefly product line." He testified that Checkers handled customer complaints about defective Firefly products (including, presumably, those manufactured before the asset purchase).

In the APA, IAT agreed to retain all liabilities arising before the sale, including "product liability." The APA disclosed a single judgment against IAT that related to the cable protector business, for $15,558.08, and total IAT indebtedness of less than $100,000 in commercial debt and a $40,000 capital loan from a relative of IAT's owners, plus $418,330.00 of shareholder paid-in capital. In exchange for the assets it was purchasing, Checkers agreed to pay IAT $160,000 immediately, plus [sixty] months of "Earnout Payments," calculated as a percentage of sales.

The evidence showed that IAT remained in business after the transaction. In the APA, IAT agreed that it would not dissolve for at least two years after the sale. Testimony of IAT's CEO[, Philip Berardi ("Berardi"),] confirmed that IAT was still in business as of August 2, 2018, [distributing] intelligent camera cranes. The Burnleys presented several pieces of evidence in an attempt to show that despite IAT's continued existence, the Burnleys had no remedy against IAT. First, the Burnleys pointed to IAT's

representation in the APA that at the time of the asset sale, IAT had "no insurance with respect to its properties, assets and operation of its [cable protector] business." Second, the Burnleys presented the testimony of FallLine's owner, Erik York [("York")], that he had considered buying the Firefly line of products in 2014, had reviewed IAT's books, and had determined that IAT's only assets were the Firefly brand and the associated inventory, trademarks, and intellectual property. . . . York also testified that IAT owed FallLine about $13,000, although he conceded that IAT had paid about half of that debt in 2015 or 2016 . . ..

* * * *

Th[e trial] court had a several discussions with counsel about how the verdict sheet should allow the jury to allocate liability among [Checkers and the settling] strictly liable and negligent defendants. The problem, th[e] court stated, was that "the negligence defendants get allocated by their relative liability; the strictly liable defendants are allocated pro rata." [The trial] court told the parties that it would list all the defendants on the verdict sheet, ask the jury to assign each liable defendant a "percentage of liability," "and then mold the verdict to apply the correct percentages." [The trial] court stated that it intended to take the total percentage of liability the jury assigned to the strictly liable defendants, "put that into one pot and divide that up equally." Both parties agreed to that organization of the verdict sheet, noting that they would deal with the issue of how to mold the verdict after the jury returned.

* * * *

[Throughout the trial, the court asked the parties for their views on whether the judge or the jury should determine the facts relevant to the product line exception and whether the exception should apply. Checkers argued that the judge should determine the facts and address whether, taken together, they justified application of the product line exception. The Burnleys contended that both of these tasks were for the jury. The day before closing arguments, the trial court informed the parties that it was going to allow the jury to weigh all of the factors relevant to the product line exception and decide whether the exception applied to Checkers.]

- 7 -

The jury returned its verdict on the morning of August 31, 2022. The jury [determined that Checkers was a successor corporation,] . . . the product[]line exception applie[d] to Checkers[,] . . . the cable protector was defective . . ., that the defect had harmed Mrs. Burnley . . ., and that . . . FOH . . . and FallLine, as well as Checkers, had manufactured, distributed, or sold the cable protector . . .. [The jury] also found that Lawall and Evan Andrews Productions were negligent and that their negligence was a factual cause in bringing harm to Mrs. Burnley . . .. When asked to attribute percentages of liability, however, the jury found Checkers 100% liable and the other defendants 0% liable . . ..

The jury awarded Mrs. Burnley $2.7 million for future medical expenses, $11,250.00 for past loss of earnings, $2.4 million for future loss of earnings, and $10 million in noneconomic damages. It awarded Mr. Burnley $3 million for loss of consortium. [The total amount awarded by the jury to the Burnleys was $18,111,250.] . . . [The trial court thereafter molded the verdict to $5,037,083.33 to Mrs. Burnley and $1,000,000.00 to Mr. Burnley.]

* * * *

Checkers timely filed a post-trial motion, seeking judgment notwithstanding the verdict [("JNOV")] or a new trial. The Burnleys timely filed a motion for delay damages. The Burnleys [filed a motion for delay damages but] did not seek any other relief other than delay damages. Importantly, the Burnleys did not ask th[e trial] court to reconsider its decision to apportion liability among the three strictly liable defendants.

On January 10, 2023, th[e trial] court [entered an order] den[ying] Checkers' motion for post-trial relief[, granting] the Burnleys' motion for delay damages on the award "on [Mrs.] Burnley's claims, as molded by the court," but den[ying] the motion for delay damages on the award for Mr. Burnley's loss of consortium claim. [On that same date, the trial court] entered judgment against Checkers for $7,354,716.83.

Trial Court Opinion, 7/10/23, at 1, 3-8, 10-12, 14, 16-17 (citations, footnotes,

and unnecessary capitalization omitted). Checkers filed a timely notice of

appeal and the Burnleys filed a timely notice of cross-appeal. The parties and the trial court complied with Pa.R.A.P. 1925.

In its appeal, Checkers raises the following issues for our review:

A. SHOULD THIS COURT VACATE THE JURY'S VERDICT AND ENTER [JNOV] IN FAVOR OF CHECKERS, BECAUSE THE SUPREME COURT HAS NOT ADOPTED THE PRODUCT LINE EXCEPTION TO SUCCESSOR LIABILITY, BECAUSE [THE BURNLEYS] FAILED TO MEET THEIR BURDEN OF PROVING THAT THE EXCEPTION APPLIES TO CHECKERS, AND WHERE THE JUDGE IMPROPERLY ALLOWED THE JURY TO DECIDE THIS ISSUE?

B. IN THE ALTERNATIVE, SHOULD THIS COURT GRANT A NEW TRIAL, BECAUSE THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING CHECKERS' MOTION FOR A MISTRIAL AND IN ALLOWING INTO EVIDENCE A PORTION OF CHECKERS' [APA] WITH IAT, WHICH INDICATED THAT IAT HAD NO INSURANCE WITH RESPECT TO THE ASSETS AT ISSUE AT THE TIME OF THE AGREEMENT'S EXECUTION?

C. SHOULD THIS COURT GRANT A NEW TRIAL, BECAUSE THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING CO-DEFENDANT, FALL[]LINE, TO PROVIDE IRRELEVANT AND PREJUDICIAL TESTIMONY REGARDING THE ASSETS OF IAT AT THE TIME FALL[]LINE EXPLORED PURCHASING IAT'S CABLE PROTECTOR LINE?

D. SHOULD THIS COURT GRANT A NEW TRIAL, BECAUSE THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING THE INTRODUCTION OF EVIDENCE PRODUCED BY [THE BURNLEYS] SHORTLY BEFORE TRIAL, WHICH INCLUDED NEW ALLEGATIONS WITH REGARD TO THE MEDICAL, WAGE LOSS, AND LOSS OF CONSORTIUM CLAIMS, FOR WHICH CHECKERS WAS DENIED SUFFICIENT OPPORTUNITY TO REFUTE SUCH NEW ALLEGATIONS?

E. SHOULD THIS COURT GRANT A NEW TRIAL, BECAUSE THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO UTILIZE CHECKERS' PROPOSED DETAILED VERDICT SLIP AFTER THE COURT DECIDED THE JURY WOULD DECIDE THE PRODUCT LINE EXCEPTION ISSUE?

F. SHOULD THIS COURT GRANT A NEW TRIAL, DUE TO THE JURY'S INCONSISTENT VERDICT?

Checkers' Brief at 2-3 (capitalization in original).

In their cross-appeal, the Burnleys raise the following issue for our review:

> Whether the trial court erred in molding the verdict to impose judgment for only one-third of the total verdict awarded against . . . Checkers, where the jury's verdict expressly [found] Checkers 100 percent liable for [the Burnleys'] damages as a matter of law made [*sic*] Checkers liable for the full amount of the jury's verdict?

Burnleys' Brief at 10.

We first address the issues raised in Checkers' appeal. In its first issue, Checkers challenges the trial court's denial of its motion for JNOV. Our standard of review of the denial of a JNOV is well-settled:

> Appellate review of a denial of JNOV is quite narrow. We may reverse only in the event the trial court abused its discretion or committed an error of law that controlled the outcome of the case. Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias[,] or ill-will.
>
> When reviewing an appeal from the denial of a request for [JNOV], the appellate court must view the evidence in the light most favorable to the verdict[-]winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences. . . . Thus, the grant of a [JNOV] should only be entered in a clear case and any doubts must be resolved in favor of the verdict[-]winner. Furthermore, [i]t is only when either the movant is entitled to judgment as a matter of law or the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant that an appellate court may vacate a jury's finding.

*Phillips v. Lock*, 86 A.3d 906, 919 (Pa. Super. 2014).

Generally, when one corporation sells or transfers all of its assets to a successor corporation, the successor corporation does not acquire the liabilities of the transferor corporation merely because of its succession to the transferor's assets. *See Dawejko v. Jorgensen Steel Co.*, 434 A.2d 106, 107 (Pa. Super. 1981). However, there are several well-recognized exceptions to the general rule regarding a successor corporation's non-liability following an asset purchase, including: (1) the successor corporation expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a consolidation or merger; (3) the successor corporation is merely a continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability. *See id*.

In *Dawejko*, a three-judge panel of this Court adopted another exception to the general rule regarding a successor corporation's non-liability following an asset purchase, known as the "product line exception." The product line exception was first articulated by the Supreme Court of California in *Ray v. Alad Corp.*, 560 P.2d 3 (Cal. 1977). Under the product line exception, "where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units in the same product line, even if previously manufactured and

distributed by the selling corporation or its predecessor." *Dawejko*, 434 A.2d at 110 (*quoting* *Ramirez v. Amsted Industries, Inc.*, 431 A.2d 811, 825 (N.J. 1981)).

After surveying case law from other jurisdictions, the *Dawejko* Court identified several factors discussed by other courts as relevant to the question of whether the product line exception should apply, including whether the successor corporation: purchased the goodwill and contract obligations of the transferor corporation; advertised itself as an ongoing enterprise; profited from and exploited all of the accumulated goodwill which the products have earned; continued to produce the same kind of product in essentially the same way, using the same equipment and designs; maintained the same product, name, management, personnel, physical location, property, and clients; solicited the predecessor's customers through the same sales representatives with no outward indication of a change in ownership; or continued the operations of the predecessor corporation while the predecessor corporation ceased its ordinary business operations. *See id*. at 108-09.

Additionally, the *Dawejko* Court paid particular attention to the three factors identified by the California Supreme Court in *Ray* as justification for the product line exception:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original

manufacturer's good will being enjoyed by the successor in the continued operation of the business.

***Dawejko***, 434 A.2d at 109 *(quoting **Ray**, 560 P.2d at 8-9)*.

Notwithstanding its recognition of these various pertinent considerations, the ***Dawejko*** Court declined to adopt a finite set of factors which must be satisfied in order for the product line exception to apply, opting instead to frame the exception in general terms, stating: "[w]e . . . believe it better not to phrase the new exception too tightly. Given its philosophical origin, it should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation." ***Id***. at 111.

Ultimately, the ***Dawejko*** Court summarized the product line exception, to be applied in Pennsylvania, as follows:

> The various factors identified in the several cases discussed above will always be pertinent -- for example, whether[:] the successor corporation advertised itself as an ongoing enterprise; or whether it maintained the same product, name, personnel, property, and clients; or whether it acquired the predecessor corporation's name and good will, and required the predecessor to dissolve. Also, it will always be useful to consider whether the three-part test stated in [***Ray***] has been met. The exception will more likely realize its reason for being, however, if such details are not made part of its formulation.

***Dawejko***, 434 A.2d at 111 (citations omitted).

Notably, the Pennsylvania Supreme Court has not expressly adopted the product line exception or decided whether a jury or a judge should decide whether the product line exception applies. ***See Schmidt v. Boardman Co.***,

11 A.3d 924, 946 (Pa. 2011) (holding that because the appellant had waived the issue, it could not address the question of whether the product line exception should be maintained in Pennsylvania, or the question of whether application of the exception should be decided by the judge or the jury).[1] However, when passing upon the specific instruction provided by the trial court to the jury for it to decide whether to apply the product line exception, the

_____

[1] In the instant matter, the trial court looked to our High Court's decision in **Schmidt**, and concluded that the jury instruction on the product line exception at issue in that case set forth six factors which "a trier of fact **must** consider." Trial Court Opinion, 7/10/23, at 8-9 (emphasis added). The trial court referred to those factors as "the **Schmidt** factors," and enumerated them as follows: (1) whether the corporation advertised itself as an ongoing enterprise; (2) whether the corporation acquired the predecessor corporation's goodwill; (3) whether the corporation maintained the same name, clients, and product; (4) whether the corporation deliberately exploited the original manufacturer's established reputation; (5) the virtual destruction of plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business; and (6) the successor's ability to assume the original manufacturer's risk spreading role and the fairness of requiring the successor to assume responsibility for defective products that were a burden attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business. **See id**. at 8-9 (*quoting* **Schmidt**, 11 A.3d at 946). Notably, each of these factors was initially identified by the **Dawejko** Court. Moreover, because the **Schmidt** Court did not expressly adopt the product line exception, it repeatedly recognized **Dawejko** as "the seminal product[]line [exception] decision," and determined that the jury instruction was "entirely faithful to **Dawejko**," used "the operative language of **Dawejko**," and listed "the factors identified in **Dawejko**." **Schmidt**, 11 A.3d at 944-45. Thus, as these factors originate entirely from **Dawejko**, which remains the seminal product line exception case in this Commonwealth, we decline to refer to these factors as the **Schmidt** factors and, instead, refer to them as the **Dawejko** factors. We additionally emphasize that, pursuant to **Dawejko**, there is no finite set of factors which must be satisfied in order for the product line exception to apply. **See Dawejko**, 434 A.2d at 111. Thus, the exception, as adopted in **Dawejko**, is not limited to these six factors, nor are any factors mandatory, as incorrectly stated by the trial court.

High Court held that "under the most appropriate reconciliation of presently prevailing Superior Court precedent, the trial court did not err in its main instruction to the jury – under *Dawejko* - concerning the product-line exception." *Id*.[2]

As an *en banc* panel of this Court, we are not bound by a prior decision made by a three-judge panel of this same Court. *See McGrath v. Bureau of Prof'l & Occupational Affairs*, 173 A.3d 656, 661 n.7 (Pa. 2017) (holding that an *en banc* panel of an intermediate court is authorized to overrule a three-judge panel decision of the same court). Instead, we may make an independent determination regarding the issues presented and, accordingly, accept or reject the reasoning and rulings made by a prior three-judge panel. *See id*. As such, we may accept or reject the *Dawejko* Court's decision to adopt the product line exception in this Commonwealth. *See id*. Notwithstanding this latitude, however, we find no reason to overrule

_____

[2] Despite the High Court's finding in *Schmidt* that the trial court did not err with respect to the content of the jury instruction on the product line exception, as well as the fact that the Court could not reach the question of whether the application of the product line exception should be decided by the judge or the jury, the *Schmidt* Court nevertheless commented in a footnote that the appellees' characterization of the exception as "'an equitable remedy' suggests that it might more appropriately be determined by a judge." *Schmidt*, 11 A.3d at 946 n.24. The High Court further observed that the "'philosophical origin' and the looseness engrafted on the exception by *Dawejko*, encompassing the task of balancing a litany of factors (as contrasted with deciding factual matters in the context of a clearly articulated framework), also appears to militate in favor of allocating the decision to a judge." *Id*.

*Dawejko* or displace the product line exception as part of the established jurisprudence in this Commonwealth. Accordingly, we hold that *Dawejko* continues to provide the controlling parameters of the product line exception, as adopted in this Commonwealth.

Turning to the arguments presented on appeal, we initially address Checkers' issues. In its first issue, Checkers argues, without meaningful discussion or citation to pertinent legal authority, that it was entitled to JNOV because the Pennsylvania Supreme Court has not expressly adopted the product line exception to the general rule regarding successor liability following an asset purchase.[3]

We find no merit to this argument. This Court has consistently held that, as long as a decision of this Court has not been overturned by our Supreme Court, it remains binding precedent. *See Marks v. Nationwide Ins. Co.*, 762 A.2d 1098, 1101 (Pa. Super. 2000). Thus, as *Dawejko* has not been overturned by our Supreme Court, it remained binding precedent throughout the lower court proceedings. The fact that our Supreme Court has

_____

[3] We note that, pursuant to our appellate jurisprudence, "the argument portion of an appellate brief must include a pertinent discussion of the particular point raised along with discussion and citation of pertinent authorities." *Estate of Lakatosh*, 656 A.2d 1378, 1381 (Pa. Super. 1995); *see also* Pa.R.A.P. 2119(a). "This Court will not consider the merits of an argument which fails to cite relevant case or statutory authority." *Iron Age Corp. v. Dvorak*, 880 A.2d 657, 665 (Pa. Super. 2005). Failure to cite relevant legal authority constitutes waiver of the claim on appeal. *See Eichman v. McKeon*, 824 A.2d 305, 319 (Pa. Super. 2003).

not independently adopted the product line exception does not detract from the fact that the trial court in the instant matter was bound to follow **Dawejko**. Accordingly, we find no merit to this argument.

Checkers alternatively claims that it was entitled to JNOV because the Burnleys failed to prove that they had no remedy against the transferor corporation, IAT, which designed and/or manufactured the cable protector involved in Mrs. Burnley's fall. Checkers asserts that, pursuant to the APA, it purchased from IAT only those items related to the design, manufacture, distribution, and sale of cable protectors, and that IAT retained all product liability, all returns, and all warranty liability with respect to sales made by IAT. Checkers contends that it did not assume any liabilities that were caused by IAT's actions or inactions occurring prior to the execution of the APA in April 2015, including Mrs. Burnley's 2014 accident.

Checkers further points out that, pursuant to the APA, IAT was not permitted to file for dissolution for at least two years, and that Checkers would continue to make payments to IAT for five years after the execution of the APA. Checkers claims that the 2018 deposition testimony of Philip Berardi, the corporate designee for IAT, establishes that IAT was still in business in 2018, and was distributing intelligent camera cranes. Checkers also points to the testimony of Erik York, the corporate designee for FallLine, that FallLine was able to recover money from IAT in 2015 or 2016. Checkers maintains that the APA, as well as the testimony of the corporate designees for IAT and

FallLine, indicate that IAT remained in business until at least 2018, was entitled to receive payments under the APA from Checkers through 2020, and specifically retained all product liability for products sold by IAT, such as the cable protector involved in Mrs. Burnley's accident.

Checkers contends that the public policy behind the product line exception is to protect plaintiffs left without a remedy due to corporate purchases. Checkers argues that, because IAT continued to exist and the Burnleys simply failed to seek a recovery against that company, the main rationale for the application of the product line exception is absent. Checkers additionally contends that, because there was no evidence that Checkers knew or could have known of the manufacturing defect, the policy justification for the product line exception has less force, and the interests of justice, fairness, and considerations of public policy further weigh against the application of the product line exception.

Finally, Checkers asserts that the trial court erred in permitting the jury to decide the issue of whether the product line exception should apply. Checkers observes that, although the trial court initially indicated that it would weigh, at least, the fairness factor in deciding whether the product line exception applied, it ultimately allowed the jury to make this determination. Checkers claims that the trial court's failure to make a firm decision as to who would decide whether the product line exception applied caused the parties to be prejudiced and the jurors to be confused, as they did not learn of the

concept of the product line exception until the trial court provided a single jury instruction and read a single jury interrogatory regarding this issue on the last day of trial. Checkers contends that the complex weighing of equitable factors involved in determining whether the exception should apply is a matter for a judge rather than a jury.

The trial court considered Checkers' first issue and determined that it lacked merit. The court determined that the evidence was sufficient to support the jury's decision to apply the product line exception, explaining:

> First, the evidence was sufficient to show that Checkers was a "successor" to IAT[.] That is, that it had "acquire[d] all or substantially all of the manufacturing assets" of IAT. Although there was evidence that Checkers had acquired only certain IAT product lines, the testimony of Checkers' corporate designee that Checkers had purchased IAT's equipment, intellectual property, and customer lists was sufficient to allow the jury to make that finding.
>
> The evidence was also sufficient to show . . . "whether the corporation advertised itself as an ongoing enterprise . . . whether the corporation acquired the predecessor's [*sic*] corporation's goodwill . . . whether the corporation maintained the same name, clients, and product . . . [and] whether the corporation deliberately exploited the original manufacturer's established reputation." The jury heard the testimony of Checkers' corporate designee that Checkers had purchased all assets relating to IAT's cable protector business, that Checkers had continued to market its cable protectors using the "Firefly" brand and IAT's molds and logos, that Checkers announced that the purchase "[brought] together two leaders in the cable management industry," and that "Checkers continue[d] to market itself as an ongoing enterprise that manufactured and sold the Firefly product line."
>
> The Burnleys did not, on the other hand, present evidence sufficient to prove . . . "the virtual destruction of plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business." Uncontested evidence

showed that IAT continued to exist, do business as a manufacturer of intelligent camera cranes, and pay creditors for at least three years after it sold its cable protector business to Checkers (and at least two years after the Burnleys filed suit). IAT received a substantial payment from Checkers for the cable protector business, plus the right to a future stream of income, and there was no evidence that these proceeds were diverted or dissipated outside IAT. Most importantly, the Burnleys did not show that they had tried to seek compensation from IAT. It is difficult to see how a plaintiff can demonstrate the "virtual destruction of [its] remedies" without introducing evidence that it had pursued those remedies; the Burnleys certainly did not make that showing here.

The evidence that the Burnleys point to on the issue of "virtual destruction of remedies" is not helpful to them. The representation in the APA that IAT did not have "insurance with respect to its properties, assets and operation of its [cable protector] business" as of April 1, 2015, without more, cannot be read to mean that IAT lacked insurance, at the relevant times, that would have covered liability for a product sold more than a year earlier. The APA also cannot be read to show that IAT did have insurance coverage at some point that ceased to exist because of the asset sale. Similarly, Mr. York's testimony as to what he saw in IAT's books in early 2014 is not sufficient to show that the sale to Checkers "virtually destroyed" the Burnleys' remedies. Mr. York's review occurred eighteen months before the substantial cash infusion that IAT received from Checkers and, possibly, before the significant shareholder investment disclosed in the APA.

With respect to . . . "the successor's ability to assume the original manufacturer's risk-spreading role and the fairness of requiring the successor to assume responsibility for defective products that were a burden attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business," the evidence was mixed. One policy justification for the product[]line exception (and, indeed, for strict liability in general) is that the company that purchases a product line and continues to manufacture it is better able than a consumer to identify defects in the product and guard against them. This policy justification seems logical in the case of a design defect; a purchasing company will be better able than a consumer to identify and correct such a defect. In this case, however, where the defect arose from a one-time manufacturing

error and there was no evidence that Checkers knew or could have known of that error, the policy justification has less force. A second policy justification is that the purchasing company enjoys the prior manufacturer's accumulated good[]will, and should also have to accept the burdens that go along with that good[]will. That policy justification does have some force in this case, where Checkers marketed its Firefly cable protectors as a continuation of IAT's products.

Taking all . . . factors together, and viewing the evidence in the light most favorable to the verdict winners, as it must, this court cannot say that the jury's verdict was not supported by sufficient competent evidence. While the Burnleys' inability to prove that Checkers' purchase of IAT assets virtually destroyed their remedies certainly weakens their argument that the product[]line exception should apply, there was significant evidence to support the other factors . . .. Reasonable minds accordingly could disagree as to whether Checkers is entitled to relief. This court cannot second guess the jury's weighing of the various factors. Therefore, it did not err in denying Checkers' request for [JNOV].

Trial Court Opinion, 7/10/23, at 24-27 (citations, footnotes, and unnecessary capitalization omitted).

The trial court additionally found no merit to Checker's claim that the judge, and not the jury, should have decided whether the product line exception applied. The trial court explained:

At trial, [the **Schmidt** Court's] footnote, and the concerns it expresses, gave this court pause about whether it, or the jury, should decide the product[]line exception issue. [This court] concluded, however, that given the Superior Court's approval of the trial court's jury instruction in **Schmidt**, and taking into account the Burnleys' right to a jury trial, it should allow the jury to decide the issue. This decision was not an error of law or a palpable abuse of discretion.

* * * *

- 21 -

Checkers further argues that even if this court's decision to submit the issue to a jury was proper, this court erred by postponing that decision until the end of trial. Checkers waived this issue by failing to raise it during the trial. Moreover, Checkers cannot show that it was prejudiced by the timing of this court's decision. The court announced the decision the day before closing arguments, giving the parties ample time to organize their presentations to the jury.

Trial Court Opinion, 7/10/23, at 23 (unnecessary capitalization omitted).

Based on our review, we conclude that the trial court did not err or abuse its discretion in denying Checkers' motion for JNOV. In challenging the trial court's denial of its motion for JNOV, the gravamen of Checkers' argument focuses on the first *Ray* factor, which involves a consideration of whether the successor corporation's acquisition of the predecessor corporation's assets caused the virtual destruction of the plaintiff's remedies against the original manufacturer. Checkers essentially argues that, because the trial court determined that the Burnleys failed to prove that their remedy against IAT was virtually extinguished following Checkers' acquisition of IAT's assets, Checkers was entitled to JNOV as a matter of law.

Importantly, as explained above, the *Dawejko* Court declined to establish a finite set of factors that must be met in order to apply the product line exception, and specifically declined to make the *Ray* factors mandatory. Instead, the *Dawejko* Court opted to identify various considerations that are "pertinent" to this inquiry. *Dawejko*, 434 A.2d at 111. With respect to the *Ray* factors, the *Dawejko* Court stated that while "it will always be useful to consider whether the three-part test stated in [*Ray*] has been met[, t]he

exception will more likely realize its reason for being, however, if such details are not made part of its formulation." *Id*.

Although the Pennsylvania Supreme Court did not expressly adopt the product line exception, it has nevertheless confirmed that *none* of the *Ray* factors is mandatory, noting that "[i]n fact, the *Dawejko* panel took pains to clarify that it was adopting the *Ramirez* test as the core, governing standard, subject to more flexible consideration of other relevant factors, including those identified in *Ray*." *Schmidt*, 11 A.3d at 944. Moreover, our Supreme Court expressly overruled this Court's decisions in *Schmidt v. Boardman Co.*, 958 A.2d 498 (Pa. Super. 2008), and *Hill v. v. Trailmobile, Inc.*, 603 A.2d 602 (Pa. Super. 1992), to the extent that those decisions misinterpreted *Dawejko* and improperly elevated the *Ray* factors to mandatory status. *See Schmidt*, 11 A.3d at 945 (holding that "the *Schmidt* panel's elevation of the *Ray* factors to mandatory status was based on a plain misreading of the seminal product[]line decision in *Dawejko*. Thus, the most appropriate approach to reconciling governing Superior Court precedent is to correct *Hill*'s mistake and to revert to *Dawejko*").[4] Based on this established precedent, we conclude that the trial court's concern that the Burnleys failed to present sufficient

_____

[4] By implication, the *Schmidt* Court also overruled this Court's decision in *Keselyak v. Reach All, Inc.*, 660 A.2d 1350, 1354 (Pa. Super. 1995), wherein a panel of this Court relied on federal caselaw to elevate the first *Ray* factor to mandatory status and to hold that a claimant's inability to recover from the original manufacturer is a prerequisite for use of the product line exception.

evidence for the jury to find in their favor on the first **Ray** factor is not dispositive, and does not provide a basis for reversal of the order denying Checker's motion for JNOV.[5]

With respect to Checkers' claim that the trial court erred in allowing the jury to decide the issue of whether to apply the product line exception, the only basis for its claim of error is our High Court's decision in **Schmidt**. As explained above, the Pennsylvania Supreme Court has **not** addressed the question of whether application of the product line exception is a matter for determination by the judge or the jury. Although the **Schmidt** Court included a footnote observing that the appellees' characterization of the exception as an "'equitable remedy' suggests that it might more appropriately be determined by a judge," and that the "'philosophical origin' and the looseness engrafted on the exception by **Dawejko**, encompassing the task of balancing a litany of factors (as contrasted with deciding factual matters in the context of a clearly articulated framework), also appears to militate in favor of

_____

[5] Checkers directs this Court to decisions from other states and federal jurisdictions, including our federal counterparts in this Commonwealth, wherein the courts have refused to apply the product line exception when the plaintiff's remedy against the original manufacturer was not extinguished by the asset acquisition. However, Checkers reliance on those cases is unavailing, as they are not binding on this Court. **See Willard v. Interpool, Ltd.**, 758 A.2d 684, 686 (Pa. Super. 2000) (explaining that, while decisions of the lower federal courts have a persuasive authority, they are not binding on Pennsylvania courts even where they concern federal questions); **see also id**. (explaining that decisions from other states with identical issues are not binding on Pennsylvania courts).

allocating the decision to a judge," those comments can only be regarded as *dicta*, given that the question was not before the Court. **See Schmidt**, 11 A.3d at 946 n.24.[6] As a result, we are not bound by **Schmidt** on this issue.

We additionally note that, in **Dawejko**, the **jury** was asked to decide whether the successor corporations, which had acquired the assets of the original product manufacturer, could be held liable under a theory of strict products liability. In adopting the product line exception, the **Dawejko** Court affirmed the trial court's denial of the successor corporations' motion for JNOV, and determined that, on the factual record before the Court, "the **jury** was entitled to find the facts as appellees have stated them." **Dawejko**, 434 A.2d at 112 (emphasis added). Importantly, in defining the parameters of the product line exception, the **Dawejko** Court had the opportunity to designate the inquiry as a question of law for a judge to decide. However, the **Dawejko** Court did not do so. Instead, it affirmed the decision **by the jury** to impose liability on the successor corporation based on the product line exception. **See id**.; **see also Schmidt**, 958 A.2d at 514 (affirming the trial court's denial of the successor corporation's motion for JNOV, and determining that "the

_____

[6] Checkers also relies on the Third Circuit Court of Appeals' decision in **McLaud v. Indus. Res**, 715 Fed. Appx. 115, 119 (3rd Cir. 2017), wherein the Third Circuit looked to the *dicta* provided by our High Court in **Schmidt**, and concluded, based on such *dicta*, that the product line exception inquiry is a question of law for the judge to decide. As noted previously, while we may consider federal case law for its persuasive value, we are not bound to follow it. **See Willard**, 758 A.2d at 686.

evidence was sufficient to support the ***jury's*** finding that [a]ppellants were liable as the product[]line successor to [the predecessor corporation]" (emphasis added)).  Thus, we discern no error by the trial court with respect to its decision to permit the jury to decide whether the product line exception should apply to Checkers.[7]

This Court's analysis is further cabined by our well-established standard of review, which requires us to view the evidence in the light most favorable to the Burnleys, as the verdict winners, and to give them the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences.  ***See Phillips***, 86 A.3d at 919.[8]  As explained above,

_____

[7] To the extent that Checkers claims that trial court erred by delaying its decision as to whether the judge or the jury would decide the application of the product line exception until the last day of trial, the trial court determined that the issue was waived because Checkers did not raise this objection at trial.  ***See*** Trial Court Opinion, 7/10/23, at 23; ***see also*** Pa.R.A.P. 302(a) (providing that issues not raised in the trial court are waived and cannot be raised for the first time on appeal).  Checkers does not acknowledge the trial court's determination that the issue is waived.  Moreover, the record is clear that, commencing on the first day of trial, the trial court asked the parties for their views on whether the judge or the jury should determine and weigh the ***Dawejko*** factors, and informed the parties that it could hold the issue under advisement after no consensus could be reached.  ***See*** N.T., 8/22/22, at 53-54, 92-94.  As the trial court further explained: "[t]hroughout the trial, this court made it clear to the parties that it had not yet decided which issues would go to the jury.  Neither party objected to this[,] or told this court that it needed an earlier decision."  Trial Court Opinion, 7/10/23, at 9-10.  Thus, as Checkers did not raise this issue in the trial court, it is waived.

[8] We note that the trial court erred by failing to view the evidence in the light most favorable to the Burnleys, and in failing to give them the benefit of every reasonable inference arising therefrom while rejecting all unfavorable
*(Footnote Continued Next Page)*

the **Dawejko** Court identified several factors discussed by other courts as relevant to the question of whether the product line exception should apply. The first several factors identified by the **Dawejko** Court focus on the conduct of the successor corporation, including whether the successor corporation: purchased the goodwill and contract obligations of the transferor corporation; advertised itself as an ongoing enterprise; profited from and exploited all of the accumulated goodwill which the products have earned; continued to produce the same kind of product in essentially the same way, using the same equipment and designs; maintained the same product, name, management, personnel, physical location, property, and clients; solicited the predecessor's customers through the same sales representatives with no outward indication of a change in ownership; or continued the operations of the predecessor corporation while the predecessor corporation ceased its ordinary business operations. **See Dawejko**, 434 A.2d at 108-09.

At trial, Checkers' corporate designee, Eaton, testified that, prior to Checkers' acquisition of IAT's Firefly product line, Checkers was a manufacturer of cable protectors and one of its competitors was the Firefly

---

testimony and inferences. **See Phillips**, 86 A.3d at 919. While the **jury** was free to weigh and balance the evidence adverse to the Burnleys when considering the **Dawejko** factors and determining whether the product line exception should apply to Checkers, the trial court was **not** permitted to do so when ruling on Checkers' motion for JNOV. **See id**. Thus, the trial court was required to **reject** all evidence and testimony that suggested that the Burnleys failed to satisfy the first **Ray** factor. Nevertheless, as this error did not control the outcome of the case, we deem the error harmless. **See id**.

cable protector.  *See* N.T., 8/23/22, at 23-24.  Eaton confirmed that, as part of the acquisition, Checkers acquired "all Firefly inventory[,] . . . all of IAT's equipment[,] . . . customers[,] . . . customer list and good will[,] . . . all of IAT's intellectual property[,] all of the molds for cable protectors[,] . . . all of the patents for cable protectors[,] . . . all of the trade shows and tradenames concerning Firefly[,] . . . [and] "purchased not only the brand name, [but] the registered trademark as well as the patents."  *Id*. at 24-25, 26 (unnecessary capitalization omitted).  Additionally, Eaton explained that as part of the acquisition, "100 percent [of the] shareholders of IAT would remain with Checkers to assist them in terms of consulting, sales, [and] working with them."  *Id*. at 26.  Moreover, Eaton indicated that "Checkers marketed itself as an ongoing enterprise that manufactured and sold cable protectors . . . [such that] if you want to buy a Firefly product, you can go online and buy one."  *Id*.  Eaton further testified that, pursuant to a non-compete agreement, "IAT had to cease and desist any involvement in manufacturing, marketing, or selling any cable protectors."  *Id*. at 25.  The jury was also presented with the APA, which included a non-compete clause that prohibited IAT from manufacturing, marketing, or selling cable protectors for a period of ten years following the acquisition.  *See* APA, 4/1/15, at 9.

Eaton confirmed that Checkers' issued a press release on its website which announced that "Checkers . . . has acquired Firefly Cable Protectors, innovators in cable management industry . . . [and that t]his acquisition

further complements Checkers['] . . . offering and better positions the company in the cable protector market. . ..'" N.T., 8/23/22, at 27-28. The press release additionally stated: "[t]his acquisition brings together two leaders in the cable management industry and allows [Checkers] to offer our customers . . . the most innovative cable protectors on the market." *Id*. at 29.

Eaton explained that, after the acquisition, Checkers "continued to sell . . . Firefly cable protectors with the Firefly on it and the IAT [logo stamped] on it." *Id*. at 30. Eaton testified that "the Firefly brand was so prominent that Checkers actually has sales brochures just dealing with the Firefly brand." *Id*. Eaton indicated that, as of the time of trial in this matter, Checkers was still manufacturing cable protectors using molds with the Firefly trademark and the IAT logo. *Id*. at 30-32. In fact, Eaton stated that "every product that is sold with Firefly has the IAT [stamped] on the product." *Id*. at 32.

Viewing this evidence and testimony in the light most favorable to the Burnleys as the verdict winners, and giving them the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences, we conclude that the jury was presented with sufficient evidence to find the initial *Dawejko* factors were present, including: that Checkers, as the successor corporation, purchased the goodwill and customer list of IAT; that Checkers advertised itself as an ongoing enterprise with respect to the Firefly product line; that Checkers profited from and

exploited all of the accumulated goodwill which the Firefly products had earned; that Checkers continued to produce the same Firefly product in essentially the same way, using the same equipment, molds, and designs; that Checkers maintained the same product, product name, management, personnel, and clients; that Checkers solicited IAT's customers; and that Checkers continued IAT's operations with respect to the Firefly product line while IAT ceased all business operations with respect to the manufacture, marketing, and selling of any cable protectors. *See Dawejko*, 434 A.2d at 108-09.

As for the remaining *Dawejko* factors, as taken from *Ray*, the jury was asked to consider whether the acquisition by Checkers of the Firefly product line resulted in: (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business. *See Dawejko*, 434 A.2d at 109. Once again, pursuant to our JNOV standard of review, we may only consider the evidence which was favorable to the Burnleys when considering these factors, and must reject all unfavorable testimony and inferences. *See Phillips*, 86 A.3d at 919.

The record reflects that the jury was provided with sufficient evidence to determine whether the successor corporation's acquisition of the product line in question resulted in the virtual destruction of the Burnleys' remedies against IAT, as the original manufacturer. **See Dawejko**, 434 A.2d at 109. Pursuant to the APA, as of April 2015, IAT had indebtedness of more than $558,888.00, including *inter alia*, a judgment lien of $15,558 that remained unpaid since June 2012, a $85,000 commercial debt, a $40,000 capital loan from a relative of IAT's owners, and $418,330.00 in paid-in capital owed to shareholders. **See** APA, 4/1/15, at Schedule 4.10-Indebteness. Additionally, FallLine's designee, Erik York, indicated that FallLine had considered buying the Firefly product line in 2014, but after conducting due diligence and reviewing IAT's books, he determined that IAT had no assets other than the Firefly product line, which consisted of the inventory, equipment, patents, and trademarks associated with the Firefly brand. **See** N.T., 8/23/22, at 64-65, 67. York additionally testified that IAT owed FallLine $13,000, and that IAT recovered only $6,000 of that debt through a collection agency in 2015 or 2016. **See id**. at 88. Viewing this evidence and testimony in light most favorable to the Burnleys, we conclude that such evidence and testimony was sufficient to permit the jury to reasonably infer that: IAT was burdened with indebtedness of more than $558,888.00 and could not satisfy its existing debts; that IAT had not been able to pay a judgment lien of $15,558 that had been pending for three years; that FallLine had been unable to collect on the

$13,000 it was owed by IAT and had to resort to a collection agency, through which it was ultimately only able to recover $6,000; and that, following Checkers' purchase of the Firefly product line, IAT was left with no assets to compensate the Burnleys for losses caused by a defective Firefly cable protector.

We further conclude that the jury was presented with sufficient evidence to determine the successor's ability to assume the original manufacturer's risk-spreading role. *See Dawejko*, 434 A.2d at 109. Checkers' corporate designee, Eaton, testified that, "[i]f a customer would contact Checkers with a Firefly product that was defective or a problem," Checkers "would address that problem" not just within "the manufacturer warranty frame," but "within any timeframe." N.T., 8/23/22, at 39. From this testimony, the jury could reasonably infer that Checkers had the ability to assume IAT's risk-spreading role as the original product manufacturer based on Checkers' willingness to address any problems or defects with Firefly products, including those that were manufactured and distributed by IAT or were otherwise outside the manufacturer warranty period.

Finally, the jury was presented with sufficient evidence to determine the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business. *See Dawejko*, 434 A.2d at 109. As explained above, Eaton

confirmed that Checkers issued a press release on its website which announced that "Checkers . . . has acquired Firefly Cable Protectors, innovators in cable management industry . . . [and that t]his acquisition further complements Checkers['] . . . offering and better positions the company in the cable protector market. . .." N.T., 8/23/22, at 27-28. The press release additionally stated: "[t]his acquisition brings together two leaders in the cable management industry and allows [Checkers] to offer our customers . . . the most innovative cable protectors on the market." *Id*. at 29. Eaton testified that "Checkers marketed itself as an ongoing enterprise that manufactured and sold cable protectors . . . [such that] if you want to buy a Firefly product, you can go online and buy one." *Id*. at 26. Eaton testified that "the Firefly brand was so prominent that Checkers actually has sales brochures just dealing with the Firefly brand." *Id*. Eaton indicated that, as of the time of trial in this matter, Checkers was still manufacturing cable protectors using molds with the Firefly trademark and the IAT logo, and that that "every product that is sold with Firefly has the IAT [stamped] on the product." *Id*. at 30-32. We conclude that this testimony provided the jury with sufficient evidence from which it could reasonably infer that: there was a tremendous amount of goodwill associated with Firefly cable protectors; the popularity and demand for Firefly cable protectors was so great that Checkers had to create a separate brochure solely for Firefly products; that Checkers sought to exploit the goodwill associated with the Firefly product line by

issuing a press release announcing its purchase of the Firefly product line; that Checkers marketed its acquisition of the Firefly product line as an ongoing business and allowed customers to purchase Firefly cable protectors on its website; and that, based on these considerations, it would not be unfair to require Checkers to assume the responsibility for defective Firefly products manufactured by IAT because such a burden necessarily attached to the accumulated goodwill for the Firefly product line being enjoyed by Checkers in the continued operation of that product line.

In sum, we conclude that the evidence was sufficient to support a determination by the jury that each of the *Dawejko* factors was satisfied such that the product line exception should apply, and Checkers should be found liable to the Burnleys under the exception. We do not find any basis in the record to reach a contrary conclusion that Checkers was entitled to judgment as a matter of law or that the evidence was such that no two reasonable minds could disagree that judgment should have been rendered for Checkers. *See Lock*, 86 A.3d at 919. As such, we affirm the trial court's denial of Checkers' motion for JNOV. Thus, Checkers' first issue merits no relief.

In its second issue, Checkers challenges the trial court' denial of its motion for mistrial based on the court's ruling to admit the portion of the APA which indicated that IAT had no insurance as of the date of the execution of the APA on April 1, 2015. Our standard of review regarding a trial court's denial of a motion for a new trial is limited: "[t]he power to grant a new trial

lies inherently with the trial court and we will not reverse its decision absent a clear abuse of discretion or an error of law which controls the outcome of the case." ***Kaplan v. O'Kane***, 835 A.2d 735, 737 (Pa. Super. 2003) (citation omitted). Further, the admission of evidence is within the sound discretion of the trial court and will not be reversed absent a clear abuse of that discretion. ***See Cooke v. Equitable Life Assurance Society of the United States***, 723 A.2d 723, 729 (Pa. Super. 1999).

Rule 401 of the Pennsylvania Rules of Evidence provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "All relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402. Generally, a trial judge should admit all relevant evidence unless a specific rule bars its admission. ***See Valentine v. Acme Mkts.***, 687 A.2d 1157, 1160 (Pa. Super. 1997). "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Pennsylvania Rule of Evidence 411 provides that "[e]vidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully." Pa.R.E. 411. Rule 411 is consistent with the general rule in Pennsylvania that evidence of

insurance is irrelevant and prejudicial and justifies the grant of a mistrial. *See Dolan v. Carrier Corp*., 623 A.2d 850, 853 (Pa. Super. 1993).

However, the mere mention of the word insurance does not necessitate a new trial unless the aggrieved party can demonstrate prejudice. *See Allied Elec. Supply Co. v. Roberts*, 797 A.2d 362, 364 (Pa. Super. 2002). Moreover, Rule 411 includes an exception to the general rule and provides that "the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control." Pa.R.E. 411.

Checkers asserts that the trial court abused its discretion by permitting into evidence the portion of the APA which disclosed that IAT "currently had no insurance with respect to its properties, assets, and operation of its [cable protector] [b]usiness," as of the time of the execution of the APA on April 1, 2015. Checkers' Brief at 31 (*quoting* APA, 4/1/15, at Section 4.12). Checkers asserts that the Burnleys' counsel attempted to ask Justin Lytle, a Checkers' representative, to read into evidence this portion of the APA, which reflected that IAT lacked insurance at the time of the execution of the APA. According to Checkers, defense counsel immediately objected to the introduction of this evidence at sidebar, and also requested a mistrial, which the trial court

denied.[9]  Checkers claims that the introduction of this evidence was irrelevant and highly prejudicial because it distracted the jury from the essential issues it was to resolve and provided an improper basis upon which the jury could make its decision.  Checkers maintains that the issue of whether IAT had insurance at the time of the execution of the APA has no bearing on the first *Ray* factor relating to whether the APA resulted in the virtual destruction of the Burnleys' remedies against IAT, and its admission led the jury to improperly determine that the Burnleys had no remedy as to IAT.

The trial court considered Checker's second issue and determined that it lacked merit.  The court initially concluded that evidence of IAT's insured status on April 1, 2015, was not determinative of the first *Ray* factor pertaining to whether the APA virtually extinguished the Burnleys' remedies against IAT, stating:

> . . . The representation in the APA that IAT did not have "insurance with respect to its properties, assets and operation of

---

[9] Checker further claims that defense counsel requested a curative instruction, which the trial court declined to give at the time this testimony was elicited. **See** Checkers' Brief at 31; **see also** N.T., 8/29/22, at 80.  However, Checkers did not raise any objection to the trial court's ruling on its request for a limiting instruction in its concise statement.  **See** Concise Statement, 3/2/23, at 2. Instead, Checkers merely challenged the trial court's decision to overrule its objection to the testimony and its denial of Checkers' motion for mistrial.  **See id**.  Accordingly, we deem any challenge to the trial court's decision not to provide a limiting instruction as waived.  **See** Pa.R.A.P. 1925(b)(4)(vii) (providing that issues not included in the concise statement are waived); **see also Newman Dev. Group of Pottstown, LLC v. Genuardi's Family Mkt., Inc.**, 98 A.3d 645, 665 n.24 (Pa. Super. 2014) (*en banc*) (holding that an issue not included in a concise statement, or fairly subsumed therein, is waived).

its [cable protector] business" as of April 1, 2015, without more, cannot be read to mean that IAT lacked insurance, at the relevant times, that would have covered liability for a product sold more than a year earlier. The APA also cannot be read to show that IAT *did* have insurance coverage at some point that ceased to exist because of the asset sale.

Trial Court Opinion, 7/10/23, at 25.

The trial court additionally reasoned:

[T]his [c]ourt did not abuse its discretion in permitting [admission of] the insurance provision in the APA. Checkers opened the door to this evidence by using the APA as an exhibit and soliciting broad-ranging testimony about its other provisions; evidence of the insurance provision was appropriate to give a more complete story of the transaction. The testimony did not violate [Rule] 411, because evidence of insurance was not introduced to prove "whether [IAT or Checkers] acted negligently or otherwise wrongfully." Finally, the evidence was not harmful or prejudicial to Checkers.

*Id*. at 27.

In addressing this issue, we initially observe that Rule 411 prohibits the admission of evidence of liability insurance for purpose of proving a **party** "acted negligently or otherwise wrongfully." Pa.R.E. 411. Here, IAT was not a party to the litigation. Moreover, the evidence of IAT's lack of insurance as of April 1, 2015, was not admitted for the purpose of proving that any party to the litigation acted negligently or wrongfully more than seven months prior to the execution of the APA. Stated differently, the evidence was not admitted for the purpose of proving that IAT, or even Checkers, acted negligently or wrongfully. **See id**.

Further, Rule 411 expressly provides that evidence of insurance may be admitted for other purposes. *See id*. Here, the trial court reasoned that this provision in the APA was appropriate to give a more complete story of the transaction. *See* Trial Court Opinion, 7/10/23, at 27. In our view, the information that IAT would have no insurance as of the date of the APA was relevant to other *Dawejko* factors, including whether IAT, as the predecessor corporation, ceased its ordinary business operations as a result of the asset transaction. *See Dawejko*, 434 A.2d at 108-09. Thus, this evidence of IAT's insurance status as of the date of the asset purchase transaction was permitted to be introduced for another purpose. *See* Pa.R.E. 411.

Nonetheless, we agree with the trial court that this information was of little relevance with respect to the first *Ray* factor regarding whether the asset transaction virtually extinguished the Burnley's remedies against IAT. Whether IAT had insurance at the time of the execution of the APA on April 1, 2015, was not determinative of whether IAT had a liability insurance policy in place on September 26, 2014, the date of Mrs. Burnley's accident, which may have provided coverage for the Burnleys' injuries and damages.

While we acknowledge that there was a potential for the jury to misunderstand the significance, or lack thereof, of the absence of insurance for IAT as of April 1, 2015, we find no clear abuse of discretion by the trial court in denying Checker's motion for mistrial on this basis. Although the court declined to provide a limiting instruction at that time, nothing prevented

Checkers from requesting a limiting instruction at a later time, nor defense counsel from explaining to the jury in closing arguments that the absence of insurance on April 1, 2015, did not mean that Checkers did not have liability insurance in place on September 26, 2014, which could have provided the Burnleys with a remedy against IAT.

Moreover, given that there are numerous *Dawejko* factors that the jury was required to consider, none of which are mandatory, and that the challenged evidence was relevant to at least one other such factor, we cannot conclude that the mere *potential* for the jury to misinterpret the challenged evidence as to another such factor "control[ed] the outcome of the case." *Kaplan*, 835 A.2d at 737. Indeed, Checkers can only speculate that the jury misinterpreted this information, or that the absence of such information would have resulted in a different outcome at trial, such as the jury finding that none of the remaining *Dawejko* factors had been satisfied. As such, Checkers has not convinced this Court that, but for the admission of the provision in the APA that IAT had no insurance as of April 1, 2015, the jury would have found that the product line exception did not apply and entered a verdict in favor of Checkers. Thus, as we discern no clear abuse of discretion by the trial court in denying Checkers' motion for mistrial, its second issue merits no relief.

In its third issue, Checkers argues that the trial court abused its discretion by permitting the testimony of FallLine's corporate designee, York, that he had considered purchasing all of IAT's assets in 2014 or 2015 and that

he determined IAT's only assets at that time consisted of the Firefly cable protector product line.  As indicated above, the admission of evidence is within the sound discretion of the trial court and will not be reversed absent a clear abuse of that discretion.  *See Cooke*, 723 A.2d at 729.

It is axiomatic that an objection to the admission of evidence is waived if not timely raised at trial.  *See* Pa.R.E. 103(a) (providing that a party may claim error in admission of evidence only when that party makes a timely and specific objection); *see also Parr v. Ford Motor Co.*, 109 A.3d 682, 709 (Pa. Super. 2014) (holding that the failure to make a contemporaneous objection waives an issue on appeal).  Further, an evidentiary ruling must not only be erroneous; it must also be harmful.  *See Cummins v. Rosa*, 846 A.2d 148, 150 (Pa. Super. 2004).  An evidentiary ruling that does not affect the verdict will not be disturbed.  *See id*.

Checkers asserts that York's testimony was irrelevant to the issue of IAT's remaining assets at the time of the execution of the APA and was highly prejudicial to Checkers.  According to Checkers, York was not involved in the APA between Checkers and IAT and had no personal knowledge as to the assets involved in that agreement.  Checkers argues that York's testimony served only to prejudice Checkers by allowing the jury to rely upon his statements to speculate that IAT had no assets after the execution of the APA and that the Burnleys had no viable remedy against IAT as of April 2015. Checkers contends that York's testimony should have been excluded since any

probative value it had was outweighed by the unfair prejudice to Checkers and the potential to mislead the jury.

The trial court considered Checkers third issue and determined that it lacked merit. The court reasoned:

> [T]his court did not abuse its discretion in overruling Checkers' objection to Mr. York's testimony about his review of IAT's books. Mr. York gave [this] testimony without objection; Checkers' counsel did not object until the Burnleys' counsel began asking follow[-]up questions, and did not ask this Court to strike the previous responses. N.T.[, 8/23/22,] at 64-65. Accordingly, this objection was waived. Moreover, Mr. York's testimony was relevant to the product[]line exception . . . and was not prejudicial.

Trial Court Opinion, 7/10/23, at 27-28 (unnecessary capitalization omitted).

Our review of the record confirms that Checkers' counsel made no objection to the subject testimony. York was asked several questions about the potential purchase of all of IAT's assets and he confirmed that the only assets which IAT had consisted of the Firefly product line. *See* N.T., 8/23/22, at 64-65. Specifically, York stated, "[IAT] wanted too big of a number - - to buy their assets, which their assets were just the cable protector. That's all they were doing. That - - was the entire company of Firefly. It was just the cable protectors." *Id*. York went on to testify that "there [were no] assets that IAT had other than the Firefly line, the equipment, the patents, [and] trademarks." *Id*. at 65. No objection was made to this line of inquiry or to York's responses.

After a brief sidebar, the questioning of York resumed. Checkers' counsel then objected to a subsequent question to York which elicited essentially the same response that he had already provided regarding the absence of any assets owned by IAT other than the Firefly product line. *See id*. at 66-67. Specifically, York testified that "[IAT did not] have any assets other than the Firefly brand, all of the equipment, the inventory, the patents, the trademarks." *Id*. at 67. However, Checkers' counsel objected to this testimony solely on the basis that the question had been "[a]sked and answered." *Id*. at 67. The trial court overruled the objection. *Id*. Notably, Checkers made no objection to this testimony on the basis that it was irrelevant or prejudicial.

The only relevancy objection made by Checkers' counsel was in response to a subsequent question posed to York: "[w]hen FallLine went to purchase - - or did the due diligence in purchasing the assets of IAT, was it important for FallLine to know what assets IAT had?" N.T., 8/23/22, at 66. The trial court overruled this relevancy objection. Thereafter, York testified "yes . . . when purchasing a company, you want to know all the assets and you want to know everything about that company. And Firefly's assets were the - - the cable protector and their patents and things . . . that go along with that cable protector." *Id*. at 67.

It is clear that Checkers now seeks to rely on its relevancy objection to the **subsequent** questioning of York as a basis to challenge the initial

questions posed to York—to which Checkers made no relevancy or prejudice objection. This it cannot do. Thus, as no relevancy or prejudice objection was made to any of the initial testimony by York that there were no assets that IAT had other than the Firefly line, any challenge to that testimony based on relevancy or prejudice is waived. **See** Pa.R.E. 103(a); **see also Parr**, 109 A.3d at 709.[10] Accordingly, Checkers' third issue merits no relief.

In its fourth issue, Checkers contends that the trial court abused its discretion by denying its requests for a continuance of the trial. Our review of a trial court's decision to grant or deny a request for continuance is well-settled:

> The trial court is vested with broad discretion in the determination of whether a request for a continuance should be granted, and an appellate court should not disturb such a decision unless an abuse of that discretion is apparent. An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless

_____

[10] In any event, the trial court deemed the challenged testimony to be relevant to the product line exception, and further determined that it was not prejudicial. **See** Trial Court Opinion, 7/10/23, at 27-28. On the record before us, we discern no abuse of discretion by the trial court in reaching this determination. The viability of IAT as a corporation following the sale of its assets to Checkers was entirely relevant to the central question in the litigation; namely, whether Checkers could be found liable under the product line exception. Specifically, it was relevant to the **Dawejko** factor concerning whether the sale virtually extinguished the Burnleys' remedies against IAT. Thus, to the extent that York's challenged testimony had any tendency to make that fact more or less probable, the trial court did not abuse its discretion by admitting it as relevant evidence. **See** Pa.R.E. 401; **see also Valentine**, 687 A.2d at 1160. Moreover, as Checkers has failed to convince us that the admission of this particular testimony affected the verdict, we decline to disturb the trial court's ruling. **See Cummins**, 846 A.2d at 150.

the record discloses that the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias or ill-will.

***Baysmore v. Brownstein***, 771 A.2d 54, 57 (Pa. Super. 2001) (citations omitted).

The coordinate jurisdiction rule prohibits a judge from overruling the decision of another judge of the same court, under most circumstances. ***See Ryan v. Berman***, 813 A.2d 792, 794 (Pa. 2002). Departure from the rule is allowed only in exceptional circumstances, such as where there has been an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed. ***See id***.

Checkers argues that the trial court abused its discretion by denying its motion for extraordinary relief and its motions *in limine* seeking a continuance of the August 22, 2022 trial date based on newly disclosed evidence. Checkers asserts that, one month prior to trial, the Burnleys provided supplemental discovery responses in which they indicated that Mrs. Burnley was terminated from her new employment at Organon as of June 29, 2022. Checkers also points to the Burnleys' disclosure on July 22, 2022, that Mrs. Burnley was scheduled to undergo surgery for the implantation of a spinal cord stimulator eleven days prior to trial. Checkers asserts that Mrs. Burnley's termination from her employment for Organon had a significant impact on her claim for future economic damages, as she had been working for her prior employer,

Janssen Pharmaceuticals, for many years without any wage loss. Checkers

further asserts that the surgery had a great impact on Mrs. Burnley's claims

for future medical and wage loss as well as non-economic damages, and

defense experts did not have the opportunity to re-examine Mrs. Burnley

before or after this new development. Checkers contends that the admission

of the Burnleys' last-minute evidence and the trial court's failure to grant a

continuance resulted in great prejudice to Checkers, as evidenced by the $2.4

million award for future wage losses and the $2.7 million award for future

medical benefits.[11]

With respect to the motion for extraordinary relief seeking a continuance

based on the late disclosures, we discern no abuse of discretion by Judge

Carpenter in denying that motion. As explained by Judge Hangley:

> Checkers filed a motion for extraordinary relief on July 26,
> 2022 asking for an emergency continuance of the August 22[,
> 2022] trial date. . . . Checkers repeated this request in a motion
> *in limine* filed on August 3, 2022 and, in a separate motion *in*
> limine, asked [the trial court] to sanction the Burnleys for the late

---

[11] Checkers additionally claims that: (1) the Burnleys failed to timely disclose that Mr. Burnley lost his job at Amtrak in 2022, and that they would be claiming that his job loss was due to Mrs. Burnley's accident; and (2) that the trial court should not have permitted the Burnleys to show to the jury graphic photographs of Mrs. Burnley's spinal cord stimulator surgery. Notably, in its concise statement, Checkers confined its fourth issue to the denial of its motion for extraordinary relief and its motions *in limine*. **See** Concise Statement, 3/2/23, at 3. However, our review of Checkers' motion for extraordinary relief and its continuance-related motions *in limine* discloses that Checkers did not raise these additional claims in those filings. Thus, Checkers failed to preserve these additional claims for our review. **See** Pa.R.A.P. 1925(b)(4)(vii) (providing that issues not raised in the concise statement are waived).

disclosure by barring evidence on the employment and surgery issues. . . . On August 19, 2022, [Judge] Carpenter entered an order requiring Mrs. Burnley to produce medical records from the spinal cord stimulator placement before trial and to appear for a Zoom deposition, limited to the topics of [her] termination from her employment and her surgery for the spinal cord stimulator. The order also directed Checkers to submit for signature a subpoena for Mrs. Burnley's employment records.

On August 24, [2022,] Judge Carpenter entered an order formally denying the motion for extraordinary relief and referring to her August 19 order. At argument of the continuance related motions *in limine*, Checkers' counsel told [Judge Hangley] that that he had received the medical records and some, but not all, of the employment records, and had deposed Mrs. Burnley. [Judge Hangley] denied relief, finding that Judge Carpenter had adequately addressed the late-disclosure issue.

Trial Court Opinion, 7/10/23, at 5-6 (citations and unnecessary capitalization omitted).

Our review of the record confirms that prior to trial, Checkers' counsel informed Judge Hangley on the record that he had deposed Mrs. Burnley, received her updated medical records, received the employment records from Organon, from which she was terminated due to her accident-related injuries, and prior, but not the most recent employment records from Janssen Pharmaceuticals, from which she resigned. **See** N.T., 8/22/22, at 14-15. Given that Mrs. Burnley resigned from Janssen Pharmaceuticals, Judge Hangley reasoned that any missing employment records from that employer were not relevant unless Mrs. Burnley had the same problems pre-accident as she did post-accident. **See id**. at 18. Moreover, because Checkers was permitted to conduct pretrial discovery on the termination and surgery issues

and confirmed to the trial court that it otherwise obtained the testimony and documentation that it needed, we simply cannot conclude that the record discloses that the judgment exercised by Judge Carpenter was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. **See Baysmore**, 771 A.2d at 57.

With respect to Judge Hangley's subsequent denial of Checkers' motions *in limine* seeking a continuance of the trial or the preclusion of any evidence related to Mrs. Burnley's employment termination or surgery for the implantation of a spinal cord stimulator, the judge determined that her ruling was required by the coordinate jurisdiction rule:

> Here, Judge Carpenter did not abuse her discretion in denying Checkers' motion for extraordinary relief. It was within Judge Carpenter's discretion to determine that to the extent the Burnleys' late disclosures prejudiced Checkers, her remedial discovery order could address that prejudice. This trial judge properly declined to reconsider Judge Carpenter's decision; it was not permitted to do so under the coordinate jurisdiction rule.

Trial Court Opinion, 7/10/23, at 29 (unnecessary capitalization omitted).

Based on our review, we discern no error or abuse of discretion by Judge Hangley in denying Checkers' motions *in limine*. The sole issue raised in those motions was the same issue raised in the motion for extraordinary relief; namely, that Checkers was prejudiced by the late disclosures that Mrs. Burnley had been termination from her job at Organon and would be undergoing surgery for the implantation of a spinal cord stimulator. In both its motion for extraordinary relief and its motions *in limine*, Checkers claimed, as a basis for

relief, that it was entitled to obtain additional discovery on these issues. *See* Motion for Extraordinary Relief, 7/26/22, at unnumbered 3; *see also* Motion *in Limine* for Emergency Continuance, 8/3/22, at 5; Motion *in Limine* to Preclude Evidence, 8/3/22, at 4. Judge Carpenter permitted the requested discovery but denied a continuance. As such, the coordinate jurisdiction rule prohibited Judge Hangley from overruling the decision of Judge Carpenter denying the motion for extraordinary relief on the continuance issue. *See Ryan*, 813 A.2d at 794 (holding that, pursuant to the coordinate jurisdiction rule, a later motion should not be entertained or granted when a motion of the same kind has previously been denied). Moreover, Checkers has pointed to no exceptional circumstances or intervening changes in the controlling law, facts, or evidence which would warrant deviation from the rule. *See id*. Therefore, Checkers' fourth issue merits no relief.

In its fifth issue, Checkers contends that the trial court abused its discretion by denying its request to submit its proposed verdict sheet with special interrogatories directed to the jury. Generally, a trial judge may grant or refuse a request for special findings on the basis of whether such would add to the logical and reasonable understanding of the issues. *See Fisch's Parking v. Indep. Hall Parking*, 638 A.2d 217, 223 (Pa. Super. 1994). We will not disturb a trial court's decision to grant or refuse the request absent an abuse of discretion. *See id*.

Checkers argues that its proposed verdict sheet addressed the analysis required to determine whether to apply the product line exception. Checkers maintains that the concept of the product line exception is complex and involves numerous factors. Checkers asserts that the jury could have benefited from a special interrogatory that set forth all of the elements to be weighed in deciding the issue of whether Checkers was liable pursuant to the product line exception. Checkers contends that "merely asking the jury, on the verdict sheet, whether Checkers was a successor corporation and whether the product line exception applied, was confusing to the jurors and led to an improper verdict to the detriment of Checkers." Checkers' Brief at 40 (unnecessary capitalization omitted).

The trial court considered Checkers' fifth issue and determined that it lacked merit. The court reasoned:

> Checkers argues that even if this Court properly submitted the product-line exception to the jury, Checkers is entitled to a new trial because this court did not use Checkers' proposed verdict sheet. On this proposed verdict sheet, Checkers listed a number of factors—including whether Checkers "acquired IAT's goodwill," "maintained the same name, clients, and product as IAT" and "deliberately exploited IAT's established reputation"—and instructed the jury to cease deliberations if it found that the Burnleys had failed to prove any one of these factors. **See** Proposed Verdict Sheet[, 8/29/22, at 2-3]. This court did not err in disregarding this submission, which did not conform with the law set forth in **Schmidt**. Moreover, given the fact that none of the factors Checkers listed were mandatory, this court determined that it was not necessary for the jury to make findings about them and that overwhelming the jury with factual questions might confuse it. This decision was not an abuse of discretion.

Trial Court Opinion, 7/10/23, at 23 (unnecessary capitalization omitted).

- 50 -

We discern no abuse of discretion by the trial court in rejecting Checkers' proposed verdict sheet. As explained above, the Pennsylvania Supreme Court clarified in **Schmidt** that **none** of the factors identified by the **Dawejko** Court as relevant to the product line exception inquiry is mandatory, noting that "[i]n fact, the **Dawejko** panel took pains to clarify that it was adopting the **Ramirez** test as the core, governing standard, subject to more flexible consideration of other relevant factors, including those identified in **Ray**." **Schmidt**, 11 A.3d at 944. Indeed, our Supreme Court expressly overruled this Court's decisions in **Schmidt**, 958 A.2d 498, and **Hill**, 603 A.2d 602, to the extent that those decisions misinterpreted **Dawejko** and improperly elevated the **Ray** factors to mandatory status. **See Schmidt**, 11 A.3d at 945.

Here, Checkers' proposed verdict sheet sought to instruct the jury to cease deliberations and "return to the [c]ourtroom," if it found that the Burnleys had failed to prove by a preponderance of the evidence any one of the following five factors: (1) "Checkers advertised itself as an ongoing enterprise of . . . [IAT];" (2) "Checkers acquired IAT's goodwill;" (3) "Checkers maintained the same name, clients, and product as IAT;" (4) "Checkers deliberately exploited IAT's established reputation;" and (5) "Checkers' acquisition of the Firefly line from IAT cause[d] the virtual destruction of [the Burnleys'] remedies against IAT." Proposed Verdict Sheet, 8/29/22, at 2-3. Thus, the proposed verdict sheet purported to instruct the jury that the Burnleys were required to prove five of the **Dawejko** factors by a

preponderance of the evidence, and that if the Burnleys failed to prove any one of these five factors by a preponderance of the evidence, then the jury must cease deliberations and return to the courtroom. *See id*.

As explained above, *none* of the factors identified by the *Dawejko* Court as relevant to the product line exception inquiry is mandatory. Accordingly, the proposed verdict sheet, which sought to elevate five of the *Dawejko* factors to mandatory status, provided a patently incorrect statement of the law which would have misled the jury. *See Schmidt*, 11 A.3d at 945. Therefore, we discern no abuse of discretion by trial court in refusing to submit it to the jury.

In its final issue, Checkers claims that it was entitled to JNOV because the verdict was inconsistent. Preliminarily, we must determine whether Checkers preserved the issue for our review. The issue of waiver presents a question of law, and, as such, our standard of review is *de novo*, and our scope of review is plenary. *See Stapas v. Giant Eagle*, 197 A.3d 244, 248 (Pa. 2018); *see also* Pa.R.A.P. 302(a) (providing that issues not raised in the trial court are waived and cannot be raised for the first time on appeal).

A party waives post-trial relief based on inconsistent verdicts by failing to object at trial to the verdict sheet that permitted the inconsistent verdicts or by not objecting to the alleged inconsistency before the jury's discharge. *See Straub v. Cherne Industries*, 880 A.2d 561, 566-68 (Pa. 2005) (reversing JNOV based on the theory that the verdict on one claim precluded

liability on another claim, because defendant did not object to the verdict sheet or to verdict when rendered); *see also Bert Co. v. Turk*, 257 A.3d 93, 112 (Pa. Super. 2021) (finding waiver of a challenge based on inconsistent verdicts where the appellant neither objected when the jury returned an allegedly inconsistent verdict nor requested that the trial court send the jury back for further deliberations); *Picca v. Kriner*, 645 A.2d 868, 871 (Pa. Super. 1994) (holding that when a party fails to object to an inconsistent verdict before the jury is discharged, it constitutes waiver).

Here, the trial court considered Checkers' sixth issue and determined that the issue is waived. The court reasoned:

> It is difficult to reconcile the jury's responses to questions 5 and 6 on the verdict sheet (in which the jury found that Lawall and Evan Andrews Productions were negligent and that this negligence caused harm to Mrs. Burnley) and question 7 (in which the jury assigned 0% liability to these defendants). However, Checkers' counsel did not raise the inconsistency issue before the jury was dismissed; this deprived the jury of the opportunity to revisit its responses. Therefore, Checkers waived this issue.

Trial Court Opinion, 7/10/23, at 28 (unnecessary capitalization omitted).

Our review of the record confirms that Checkers failed to lodge any objection to the verdict as inconsistent prior to the discharge of the jury. *See* N.T., 8/31/22, at 16-19. Accordingly, Checkers failed to preserve this issue for our review.

Having determined that Checkers is not entitled to relief on any of its issues, we now turn to the sole issue raised in the Burnleys' cross-appeal. Therein, the Burnleys contend that, because the jury found Checkers to be

100% liable and all other defendants 0% liable, the trial court erred by failing to enter judgment against Checkers for the entire amount of the jury's verdict. Once again, we must determine whether Checkers preserved the issue for our review.

Pennsylvania Rule of Civil Procedure 227.1 governs post-trial relief and requires parties to file post-trial motions in order to preserve issues for appeal. The Rule provides in relevant part that, after trial and upon the written motion for post-trial relief filed by any party, the court may, *inter alia*, direct the entry of judgment in favor of any party; affirm, modify or change the decision; or enter any other appropriate order. **See** Pa.R.Civ.P. 227.1(a). The Rule additionally provides that post-trial relief may not be granted unless the grounds for relief were: (1) raised in pretrial proceedings or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof or other appropriate method at trial; and (2) are specified in the post-trial motion. **See** Pa.R.Civ.P. 227.1(b). Further, "[t]he motion shall state how the grounds were asserted in pre-trial proceedings or at trial" and "a ground may not serve as the basis for post-trial relief unless it was raised in pre-trial proceedings or at trial." Pa.R.Civ.P. 227.1(b)(2). If a party has filed a timely post-trial motion, any other party may file a post-trial motion within ten days after the filing of the first post-trial motion. **Id**.

If an issue has not been raised in a post-trial motion, it is waived for appeal purposes. **See Lane Enterprises, Inc. v. L.B. Foster Co.**, 710 A.2d

54 (Pa. 1998); ***see also Bd. of Supervisors of Willistown Twp. v. Main Line Gardens, Inc.***, 155 A.3d 39, 44 (Pa. 2017) (holding that any grounds not specified in a post-trial motion are deemed waived unless leave is subsequently granted upon cause shown to specify additional grounds). The importance of filing post-trial motions cannot be overemphasized, nor can the filing requirement be disregarded as a mere technicality because post-trial motions serve an important function in the adjudicatory process by affording the trial court the opportunity to correct asserted trial error and also clearly and narrowly framing issues for appellate review. ***See Diamond Reo Truck Co. v. Mid-Pacific Indus.***, 806 A.2d 423, 428 (Pa. Super. 2002).

The Burnleys do not dispute that they failed to file a post-trial motion raising any challenge to the verdict entered on August 31, 2022. However, they claim that they could not file a timely post-trial motion challenging the molded verdict because the molded verdict was not entered by the trial court until September 8, 2022, and was not served on the parties until September 12, 2022, which was more than ten days after the verdict was entered. The Burnleys additionally argue that this Court should not find waiver because the issue was raised in their brief in opposition to Checkers' motion for post-trial relief.

The trial court considered the Burnleys' issue and determined that the issue is waived. The court reasoned:

> This court apportioned the verdict in an order docketed September 8, 2022. The Burnleys did not challenge this order in

a post-trial motion. Accordingly, any objection to the apportionment is waived. . . .

Trial Court Opinion, 7/10/23, at 30 (unnecessary capitalization omitted).

Here, in order to preserve their challenge to the trial court's order molding the verdict, the Burnleys were required to file a post-trial motion raising their specific claims of error. They did not do so. Moreover, despite the late filing and service of the molded verdict, the Burnleys had the opportunity to file a cross-motion for post-trial relief challenging the molded verdict within ten days after the filing of Checkers' post-trial motion on September 12, 2022. *See* Pa.R.C.P. 227.1(b)(2). Thus, even if the Burnleys did not receive the molded verdict until September 12, 2022, they could have filed a post-sentence motion challenging the molded verdict as late as September 22, 2022. *See id*. However, they failed to do so. Accordingly, as the Burnleys failed to raise this issue in a post-sentence motion, they failed to preserve it for our review.

Judgment affirmed.

Panella, P.J.E., and Dubow, J., Join this Opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/5/2026